**Dimitri K. SLEEM, Plaintiff,**

v.

**YALE UNIVERSITY, Defendant.**

No. 2:90CV00434.

United States District Court,
M.D. North Carolina,
Greensboro Division.

May 18, 1993.

Amended Opinion June 4, 1993.

David F. Meschan, Joseph Francis McNulty, Jr., Tuggle Duggins & Meschan, P.A., Greensboro, NC, for Dimitri K. Sleem.

Harrell Hugh Stevens, Jr., Everett, Gaskins, Hancock & Stevens, Raleigh, NC, for Yale University.

### AMENDED MEMORANDUM OPINION *

OSTEEN, District Judge.

This is a case for defamation and for negligent infliction of emotional distress. Before the court are the following motions: (1) motion by Yale University for partial summary judgment with respect to Plaintiff's claim for defamation based on libel *per se;* (2) motion by Yale University for summary judgment; and (3) motion by Yale University for partial summary judgment with respect to Plaintiff's claims for punitive damages and for presumed damages. For the reasons stated below the court will DENY Yale's motions.

### I. FACTS

Plaintiff Dimitri K. Sleem is a 1975 Yale alumnus. Like many universities, Yale hosts alumni class reunions at five-year intervals. Class reunion directories are also compiled.

At the request of the Class of 1975, Yale's Alumni Records Office mailed questionnaires to members of the Class of 1975 during 1989. The questionnaires solicited information for a class directory to be published in connection with the 15–year class reunion scheduled for May 1990. Each questionnaire requested personal data.

On or about November 17, 1989, the Alumni Records Office received a completed questionnaire bearing Sleem's name. The questionnaire included the following "personal statement":

> I have come to terms with my homosexuality and the reality of AIDS in my life. I am at peace.

This questionnaire was processed and its contents were published in the class directory entitled, "Yale 1975—Fifteen Years Out." Copies of the reunion books were mailed to members of the class in early May 1990, including approximately 18 members of the class residing in North Carolina of which three are in Guilford County.

Sleem sued Yale for defamation in November 1990, and on July 1, 1991, amended his complaint to add a claim for negligent infliction of emotional distress.

As of this date, Yale has not been able to determine who submitted the questionnaire.

Viewing the record in the light most favorable to Plaintiff, as this court must at the summary judgment stage, Sleem has forecasted the following evidence.

The questionnaires provided to members of the Class of 1975 were prepared and mailed by the Yale Alumni Records Office. Completed questionnaires were returned to the Yale Alumni Records Office and exclusively processed there. Two editorial assistants in the Alumni Records Office read the entries.

The director of the Yale Alumni Records Office, Gail Ferris, never looked at or read the reunion books before publication. (Karoline Pollack Dep. at 12–13, McKernan Dep. at 84.) There was no policy in place and no

---

* After filing the original Memorandum Opinion in this matter on May 18, 1993, typographical errors were discovered. This Amended Memorandum Opinion is to correct those errors and in no way changes the substance of the original Memorandum Opinion. The order of May 18, 1993, remains in effect.

instructions were given to the staff concerning standards to be applied with regard to editing or correcting personal comments. (Anne Pollack Dep. at 26–27.)

Ferris testified that the Alumni Records Office never changed personal comments except in the rare case of excessive length. (Ferris Dep. at 82.) There is some evidence that other types of editing have taken place. Reunion book editors in the past have been consulted for advice about particular entries that did not make sense. (McKernan Dep. at 89.) In case of anything obscene or objectionable, the reunion book editor would be contacted and the question asked: "Do you want to see it in print?" (Karoline Pollack Dep. at 9; Anne Pollack Dep. at 23–26.)

Some procedures are in place for verifying reported deaths of alumni (Corcoran Dep. at 53) and name changes. (*Id.* at 45.) No attempt was made to verify the statements made about Plaintiff in the personal statement bearing his name. *See, e.g.,* Ross Dep. at 39.

The class editor of the reunion book, Nancy Ross, a member of the Class of 1975, had no day-to-day involvement in the publication of the directory. (Ross Dep. at 34.)

Yale published the entry in the directory showing an address in Kingston, Jamaica (Sleem's address while in college), even though Yale had in its files Plaintiff's address in Fayetteville, North Carolina. Yale also had Plaintiff's Fayetteville telephone number. (Jakovenko Dep. at 66.)

The questionnaire was in Yale's possession for more than five months. (Ferris Dep., Ex. 7.)

Ferris and Sleem had mutual friends that Ferris could have contacted. (Ferris Dep. at 49–54, 57–62.)

The questionnaire had a Kingston, Jamaica address, but Plaintiff was not listed among the 18 Jamaica residents in a Yale alumni directory located in the Yale Alumni Records Office. (McKernan Dep. at 94–95.)

Two staff members spent a total of 146 hours proofreading the "Yale 1975—Fifteen Years Out" reunion book. They were aware that AIDS is an infectious disease. (Ferris Dep. at 155; Anne Pollack Dep. at 56–57; Karoline Pollack Dep. at 10–11.)

No questionnaire was sent to Sleem. (Ferris Dep. at 100, 124.)

No other entry in the "Yale 1975—Fifteen Years Out" book alleges that the individual has a sexually transmitted disease.

## II. LEGAL STANDARDS

Summary judgment is appropriate in those cases where there exists no genuine dispute as to a material fact and the moving party is entitled to a judgment as a matter of law. Of course, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Pulliam Invest. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

Since this is a diversity case, under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court must apply the substantive law of North Carolina.

Applying these principles, the court will now turn to a review of Yale's three motions.

## III. LEGAL BACKGROUND

### A. Constitutional Issues in Defamation Cases

Until *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the law of defamation was almost exclusively the province of the states. Under the then prevailing common law of libel,[1] all libels were actionable *per se.* That is, in the majority of the states, the plaintiff was required to allege and prove that the defendant made defamatory statements, of or concerning the plaintiff, which subjected the plaintiff to ridicule or contempt. Truth was an affirmative defense. No proof of fault was required, either in the form of recklessness or negligence with regard to the truth of the publication. Injury to reputation was presumed and

---

1. Written defamation is called libel. Spoken defamation is called slander. W. Page Prosser et al., *Prosser and Keeton on the Law of Torts,* § 111, at 771 (5th ed. 1984).

special damages such as pecuniary loss and emotional distress could be recovered. Punitive damages were available if common law malice were shown. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 765, 105 S.Ct. 2939, 2948, 86 L.Ed.2d 593 (1985) (White, J., concurring). The reason for allowing presumed damages for reputational injury was that "in many cases the effect of defamatory statements is so subtle and indirect that it is impossible to trace the effects thereof in loss to the person defamed." *Id.*, (quoting Restatement of Torts § 621, cmt. a, (1938)). The defendant was permitted to show that there was no reputational injury, but a plaintiff was entitled to recover at least nominal damages without special allegations or proof of damages for any defamatory publication actionable *per se*. *Id.; see also Kindley v. Privette*, 241 N.C. 140, 144, 84 S.E.2d 660, 662 (1954).

*New York Times Co. v. Sullivan* began the process of "constitutionalizing" the common law of libel. That case held that a public official cannot prevail in a state defamation action by simply proving that the publication was defamatory. Damages, either presumed or actually proved, could not be recovered without a showing of "actual malice" which required the plaintiff to prove that the publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. (This standard has been labelled "constitutional malice" to distinguish it from "common-law malice.")

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), this constitutional malice requirement was extended to cases involving "public figures." Later, in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality opinion by Justice Brennan suggested that the constitutional malice standard should extend to any defamation case involving a "matter of public or general interest" without regard to whether the defamed party was a public official, public figure, or private individual.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that the protections of *New York Times* did not extend as far as *Rosenbloom* suggested. The fact that the expression concerned a public issue did not by itself entitle the libel defendant to the constitutional protections of *New York Times*. However, the Court in *Gertz* held for the first time that a private plaintiff must prove some fault, at least negligence, to succeed on a defamation claim. The Court held that: "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 346–47, 94 S.Ct. at 3010. In addition, even with proof of negligence, presumed damages were not allowed, rather actual damages had to be proven. Actual constitutional malice had to be proven before presumed damages could be awarded. *Id.* at 349, 94 S.Ct. at 3011–12.

In *Dun & Bradstreet*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), the Supreme Court limited the scope of the constitutional protections. The Court held that "[i]n light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual (constitutional) malice.'" *Id.* at 761, 105 S.Ct. at 2946 (parenthetical added). Thus, the Supreme Court's specific holding was that in a case involving a private person plaintiff, concerning a matter not of public concern, presumed damages could be awarded without proof of reckless disregard for the truth of the defamatory publication. The essential rationale for this decision is that speech on matters of purely private concern has reduced First Amendment protection, since "[i]t is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'" *Id.* at 758–59, 105 S.Ct. at 2944–45.

The precise holding of *Dun & Bradstreet* is that presumed damages are allowed in a private individual, non-public concern case. The implication of *Dun & Bradstreet* is that in a private individual, non-public concern case, a plaintiff is no longer constitutionally required to prove fault either. *See Pearce v.*

*E.F. Hutton Group, Inc.,* 664 F.Supp. 1490, 1505, n. 21 (D.D.C.1987); *Ross v. Bricker,* 770 F.Supp. 1038, 1043 (D.V.I.1991); *see also* Rodney A. Smolla, *The Law of Defamation,* § 3.02[3] (1992). This is implied because the state interest in allowing presumed fault (i.e., presumed malice) is of similar weight as the state interest in presumed damages. Thus, *Dun & Bradstreet* allows the states to choose whether to allow presumed damages and impose liability without fault in cases involving private person plaintiffs and non-public issues.

The case at bar is a private person, non-public issue case. Thus, what North Carolina has chosen to do with regard to fault and damages is controlling.

### B. The Libel Law of North Carolina

North Carolina's libel law is a somewhat unique variation on the generic common law. Unlike many jurisdictions, not all libels are actionable *per se* in North Carolina. Instead, North Carolina divides libels into three categories: (1) libels *per se,* which are publications obviously and on their face injurious and defamatory; (2) publications which are susceptible to two reasonable interpretations, one which is obviously defamatory and the other which is not; and (3) libels *per quod,* which are publications that are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium, and explanatory circumstances. *Flake v. Greensboro News Co.,* 212 N.C. 780, 785, 195 S.E. 55, 59 (1937); *see also Arnold v. Sharpe,* 296 N.C. 533, 537, 251 S.E.2d 452, 455 (1979); *Renwick v. News & Observer Publishing Co.,* 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984); *Ellis v. Northern Star Co.,* 326 N.C. 219, 223–24, 388 S.E.2d 127, 129–30 (1990).

■ A publication is libelous *per se* only if it deals with a narrow range of statements. More specifically, a statement is libelous *per se* if, when considered alone and without innuendo, it (1) charges a person with committing an infamous crime; (2) charges a person with having an infectious disease; (3) subjects the person to ridicule, disgrace; or (4) impeaches one in his trade or profession.

*Renwick,* 310 N.C. at 317, 312 S.E.2d at 408–09 (citing *Flake,* 212 N.C. at 787, 195 S.E. at 61); *see also Arnold,* 296 N.C. at 537, 251 S.E.2d at 455; *Ellis,* 326 N.C. at 224, 388 S.E.2d at 130.

■ Significantly, if a publication is libelous *per se* the usual common law presumptions apply.

When an unauthorized publication is libelous *per se,* malice and damage are presumed[2] from the fact of publication and no proof is required as to any resulting injury. The law presumes that general damages actually, proximately and necessarily result from an unauthorized publication which is libelous *per se* and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted.

*Renwick,* 310 N.C. at 316, 312 S.E.2d at 408 (citing *Flake,* 212 N.C. at 785, 195 S.E. at 59) (footnote added).

■ As to the second type of libel, the North Carolina courts have stated that:

In an action upon a publication coming within the second class, that is, a publication which is susceptible of two interpretations, one of which is defamatory, it is for the jury to determine under the circumstances whether the publication is defamatory and was so understood by those who saw it.

*Id.*

■ As to libel *per quod,* the North Carolina Supreme Court has stated that "[i]n publications which are libelous *per quod* the innuendo and special damages must be alleged and proved." *Id.* Special damages in the context of libel *per quod* mean "pecuniary" loss. *Stutts v. Duke Power Co.,* 47 N.C.App. 76, 82, 266 S.E.2d 861, 865 (1980), (citing *Ringgold v. Land,* 212 N.C. 369, 193 S.E. 267 (1937)).

■ Thus, if a publication is libelous *per se,* it must be found by the court to be defamatory as a matter of law. In addition,

---

**2.** Presumed malice is the equivalent of strict liability.

if the publication is libelous *per se*, fault (malice) and damages (injury) are presumed. If a publication falls into the "capable of two reasonable interpretations" category, the issue of whether the publication is defamatory is an issue for the jury, as is the issue of whether it was understood to be defamatory. Damages and fault (malice), however, are still presumed. If a publication falls into the libel *per quod* category, additional elements must be proven including, most significantly, special damages.

With this background in mind, the court now turns to Yale's specific motions.

## IV. ANALYSIS OF MOTIONS

### A. Yale's Motion for Partial Summary Judgment With Respect to Plaintiff's Claim for Defamation Based on Libel *Per Se*

Yale's theory in filing a motion for partial summary judgment as to libel *per se* is as follows: (1) the publication is not libelous *per se*; (2) Plaintiff has not alleged any pecuniary damages; thus, (3) under North Carolina law, Plaintiff cannot maintain a claim for defamation. Plaintiff contests the first premise in this argument, but concedes the second, appearing to concede that Plaintiff will be "out of business" on his defamation claim unless Defendant's statement is recognized as libel *per se*.

For some reason both parties seem to have overlooked the second category of libel—publications which are "capable of two reasonable interpretations." Significantly, in this category, *presumed damages are still permitted.* There is no requirement that Plaintiff allege and prove pecuniary loss. Hence, even without proof of pecuniary dam-

ages, Plaintiff can maintain a cause of action if the statement is found to belong in this second category. Therefore, Yale's theory of the libel *per se* issue is flawed.[3]

■ Yale concedes that allegations of homosexuality may be defamatory in at least some circumstances. Furthermore, the court finds and Yale concedes that the publication could reasonably be interpreted to accuse Plaintiff of having AIDS. Thus, Yale implicitly concedes that the publication is at least in this second category.

Consequently, a ruling on the libel *per se* issue is not dispositive of Plaintiff's defamation claim. Regardless of which of the two categories the publication potentially fits, Plaintiff is still entitled to proceed with his case without alleging and proving special pecuniary damages.

■ As a result, the court declines to decide at this time whether or not the publication is libelous *per se.* What the court does decide is that the statement is either libelous *per se* or capable of two reasonable interpretations, one defamatory and one not.[4] That is, the publication is not a libel *per quod.*

Therefore, Defendant Yale's motion for partial summary judgment as to libel *per se* will be denied.

### B. Yale's Motion for Summary Judgment

#### 1. Defamation

##### a. Prima Facie Case Under North Carolina Law

As noted above, *Dun & Bradstreet* allows the states to choose whether to allow presumed damages and impose liability without

---

**3.** Thus, Yale's titling of its brief is somewhat confusing, since Yale appears to be asking the court to find that as a matter of law the publication at issue is libel *per quod.*

**4.** In determining whether a publication is susceptible to only one meaning which is defamatory, North Carolina applies a reasonable construction rule. "The principle of common sense requires that courts shall understand them as other people would. The question always is how would ordinary men understand the publication." *Renwick v. News & Observer Publishing Co.*, 310 N.C. 312, 318, 312 S.E.2d 405, 409

(1984) (citing *Flake v. Greensboro News Co.*, 212 N.C. 780, 786–87, 195 S.E. 55, 60 (1937)). Applying this rule, it appears to the court that the statement does fall into the libel *per se* category since the court believes that an "ordinary person" would conclude that the statement, in the least, charges that Plaintiff has AIDS, an infectious disease. However, the court's preference is to reserve ruling on the issue pending a jury's resolution of the issue. After all, the jury is probably the best indication of what the "ordinary person" would think.

fault in cases involving private person plaintiffs and non-public issues. North Carolina appears to have clearly made the choice that presumed damages and presumed malice (strict liability) are the rule where the publication is libelous *per se* or capable of two reasonable interpretations. *See Renwick,* 310 N.C. at 316, 312 S.E.2d at 408 (citing *Flake,* 212 N.C. at 785, 195 S.E. at 59).

Nonetheless, Yale argues that under North Carolina law, damages are not presumed and that compensatory damages can be recovered only upon a showing of negligence. In support of this assertion, Yale cites *Walters v. Sanford Herald, Inc.,* 31 N.C.App. 233, 228 S.E.2d 766 (1976), where the North Carolina Court of Appeals held that "[u]nder *Gertz,* there is no presumption of malice and damages, and fault must be alleged and established by a private citizen who seeks to recover for a defamatory falsehood." *Id.* at 235, 228 S.E.2d at 767.

This court finds that *Walters* is not an accurate statement of current North Carolina common law. First, *Walters* is a court of appeals case and *Renwick* is a subsequent Supreme Court case.

Secondly, this court notes that the apparent inconsistency of *Walters* is likely the result of the interplay between state law and the evolution of the "constitutionalization" of defamation law. After *Gertz* (1974), but before *Dun & Bradstreet* (1985), it was assumed that fault would have to be shown in all libel cases. *Walters* was decided in that interim period. However, as noted above, after *Dun & Bradstreet* it became clear that states would be constitutionally permitted to allow presumed damages (and apparently presumed malice[5]) in libel cases involving private persons and issues not of public concern.

Finally, in the North Carolina Supreme Court's most recent pronouncement on libel in 1990, Justice Mitchell wrote that "[c]ertain cases decided by the Supreme Court of the United States give rise to a question as to whether North Carolina can continue the common law presumption of damages in libel *per se* actions absent express findings of malice." *Ellis,* 326 N.C. at 223, 388 S.E.2d at 129. The word "continue" suggests that the presumption of damages even absent actual malice is, in fact, the current law in North Carolina.

Thus, since malice and damages are presumed, summary judgment for Yale is inappropriate.[6]

### b. Qualified Privilege

■ Yale argues that even if the *prima facie* elements are met, it has a defense upon which it is entitled to judgment as a matter of law—the defense of qualified privilege. If a publisher has a qualified privilege, it cannot be held liable for its defamatory publication. *Ponder v. Cobb,* 257 N.C. 281, 126 S.E.2d 67 (1962); *Stewart v. Nation–Wide Check Corp.,* 279 N.C. 278, 182 S.E.2d 410 (1971).

■ The defense of qualified privilege in a defamation case may be defeated by a showing of actual common law malice. *Id.* The North Carolina Court of Appeals has defined this type of "actual malice" in the context of an assertion of qualified privilege. "Actual malice may be found in a reckless disregard for the truth ... and may be proven by a showing that the defamatory statement was made in bad faith, without probable cause or without checking for truth by the means at hand." *Ward v. Turcotte,* 79 N.C.App. 458, 460, 339 S.E.2d 444, 446–47 (1986) (citation omitted). A similar standard was applied in the Middle District of North Carolina case decided by Judge Gordon, *Johnston v. Time, Inc.,* 321 F.Supp. 837 (M.D.N.C.1970), *aff'd in part, vacated in part,* 448 F.2d 378 (4th Cir.1971). As Judge Gordon noted, common law malice under North Carolina law must be distinguished from "constitutional malice" under the First Amendment decisions of the U.S. Supreme Court:

---

5. *See* Part III.A, pp. 61–62.

6. Furthermore, the court notes that even if Yale were correct that negligence is required under North Carolina law, summary judgment for Yale would still be inappropriate. Sleem has presented evidence upon which a reasonable juror could find negligent or even reckless disregard as to the truth of the publication. *See* Part I., pp. 59–60.

The malice necessary under North Carolina law to overcome the shield of qualified privilege should not be confused with the 'actual malice' standard which has developed from the First Amendment, freedom of the press, decisions under the United States Constitution.... North Carolina equates actual malice with reckless or careless publication.

*Id.* at 850 (citations omitted).

■ It is perhaps arguable that Yale has a qualified privilege to publish alumni directories, but the court declines to address this issue at this time. Even if there were a qualified privilege, Yale's motion for summary judgment must be denied since Sleem has raised genuine issues of material fact as to Yale's negligence.

Sleem has forecasted sufficient evidence upon which a reasonable jury could conclude that Yale acted negligently with regard to the truth or falsity of the publication. All of the facts discussed in Part I, pp. 59–60, could support a reasonable jury's finding of negligence. As a result, a question of fact is raised as to the availability of Yale's qualified privilege and summary judgment is inappropriate.

### 2. Negligent Infliction of Emotional Distress

In addition to its claim for defamation, Sleem states a claim for negligent infliction of emotional distress. Yale has moved for summary judgment as to this claim. For the reasons discussed below, this court concludes that Defendant Yale's motion should be denied.

■ To succeed on a claim for negligent infliction of emotional distress, a plaintiff has to allege and prove that (1) the defendant was negligent; (2) it was reasonably foreseeable that such negligence would cause the plaintiff severe emotional distress; (3) the negligence, in fact, caused severe emotional distress. *Johnson v. Ruark Obstetrics and Gynecology Assoc., P.A.,* 327 N.C. 283, 395 S.E.2d 85 (1990). The Court defined "severe emotional distress" as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.* at 304, 395 S.E.2d at 97. In addition to these elements articulated in *Ruark,* it may be assumed that as in any negligence case, a plaintiff would have to prove as part of his case that the defendant owed the plaintiff a duty.

■ Yale contests all of these elements and additionally raises the threshold issue of duty. However, Sleem has produced enough evidence to raise genuine issues of material fact sufficient to survive summary judgment.

### a. Duty

Yale claims that it had no duty to Sleem.[7] Yale states that it assumed no role as an editor or censor and, in fact, published a disclaimer to that effect in the directory. Yale argues that its role was similar to that of a contract printer, independent from the publication, with no duty to inspect for content. However, Sleem has produced at least some evidence that Yale did engage in some editorial control. For example, obscene language in a personal statement would apparently result in some questions being asked. Furthermore, the fact that alumni directories are at least somewhat connected to Yale's alumni fund raising efforts may be the basis for a duty. Finally, it is black letter law that parties have a duty to act reasonably. This court finds it somewhat disingenuous for Yale to claim that it should not be liable because it did not carefully review the personal statements. To the contrary, this is precisely why it might be liable.

---

7. Yale also appears to contend that this "no duty" argument has some significance for the libel claim. This court disagrees. The duty issue does not appear to have any relevance to Sleem's libel claim. First, as discussed in Part III.B. and Part IV.B.1.a., above, Sleem need not prove negligence to succeed on his libel claim. Furthermore, even if proof of negligence were required as part of a plaintiff's *prima facie* case for libel, a plaintiff need not prove the entire *prima facie* case for a standard negligence claim. Rather, a plaintiff must ultimately prove only the conduct element of a standard negligence claim.

### b. Negligent Conduct

As noted in Part IV.B.1.b., p. 65, there are genuine issues of material fact as to Yale's negligent conduct. Yale has produced evidence to the effect that it has acted in a similar manner as other universities in the publication of alumni directories. While this may be true, it is not enough to rule for Yale as a matter of law. This evidence can be presented to the fact finder should this matter proceed to trial.

### c. Foreseeability

Yale also claims it is not foreseeable that a publication of an alumni directory might cause injury. However, the court is not willing to agree to this as a matter of law. The court finds that a reasonable person could foresee that a false entry could be submitted and cause injury. In any case, this is a jury question.

### d. Severe Emotional Distress

Sleem has forecasted psychiatric evidence which appears to fall under the definition of "severe" emotional distress as defined in *Ruark*, 327 N.C. at 304, 395 S.E.2d at 97. *See* Dep. of John Paul Blake, M.D., P.A. Yale apparently does not contest this. Thus, summary judgment is not appropriate as to this issue.

### e. Causation

Once again, it is a jury question whether or not the publication caused injury to Plaintiff.

### C. Yale's Motion for Partial Summary Judgment With Respect to Plaintiff's Claims for Punitive Damages and for Presumed Damages

Yale has also filed a motion for partial summary judgment as to presumed and punitive damages.

### 1. Presumed Damages

 Yale raises the novel argument that presumed damages are unconstitutional in violation of both the Due Process Clause of the United States Constitution and the Law of the Land Clause of the Constitution of North Carolina.

Yale argues that presumed damages are inherently speculative and irrational. In addition, Yale argues that presumed damages invite jury awards based on emotion and prejudice since there are really no comprehensible criteria to instruct a jury and that presumed damages allow plaintiffs to obtain significant recoveries even if no actual injury occurred. Indeed, Yale argues, that the problem is especially egregious in this case where Yale has produced some evidence of no actual injury. Thus, Yale concludes that presumed damages offend our fundamental notions of fairness in violation of due process.

The court concedes that, as a policy matter, reasons exist to disfavor presumed damages. *See* Francis D. Murnaghan, *From Figment To Fiction To Philosophy—The Requirement Of Proof Of Damages In Libel Actions*, 22 Cath.U.L.Rev. 1 (1972); David A. Anderson, *Reputation, Compensation and Proof*, 25 Wm. & Mary L.Rev. 747, 749–56 (1984). However, there are also policy concerns which justify the allowance of presumed damages, including the perceived need to compensate victims of defamation whose reputation may be harmed even though specific proof of actual damages may be difficult. Yale overlooks that the defamatory language itself may be evidence upon which a reasonable jury could find damages. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 166A, at 843 (5th ed. 1984). As a result, while there may be room for debate concerning the wisdom of presumed damages, this court concludes that presumed damages do not violate our fundamental notions of fairness.

In addition, this court notes that the United States Supreme Court has had ample opportunity to strike down presumed damages and has not done so. *See Dun & Bradstreet*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (if plaintiff is a private person and the publication has no public concern content then presumed damages are constitutionally permissible); *see also Gertz*, 418 U.S. at 349, 94 S.Ct. at 3012 (although "the doctrine of presumed damages invites juries to punish unpopular opinion, rather than to compensate individuals for injury sustained by the publication of a false fact," presumed damages were not struck down as unconstitutional in all contexts.) It is true that in

these cases presumed damages were considered in the context of the First Amendment rather than Due Process, but the point remains that the Supreme Court has upheld presumed damages in some contexts. Perhaps the Supreme Court will one day decide to find presumed damages unconstitutional, but obviously that has not yet occurred.

Similarly, the Supreme Court of North Carolina has had an ample number of libel *per se* cases where it could have struck down the constitutionality of such damages under the North Carolina Constitution. However, the North Carolina Supreme Court has not done so. *See Renwick,* 310 N.C. at 316, 312 S.E.2d at 408 (citing *Flake,* 212 N.C. at 785, 195 S.E. at 59). The court does not believe it is appropriate to blaze a new trail in the constitutional law of North Carolina.

### 2. Punitive Damages

■ The parties appear to disagree on the appropriate level of fault needed to be shown by Sleem to recover punitive damages. The parties also disagree as to the proper evidentiary burden which must be met. Yale claims that *clear and convincing* evidence of *actual constitutional malice* is required, while Sleem claims that *common law malice,* proven by a *preponderance* of the evidence, is sufficient.

The court need not decide today which standard is appropriate under North Carolina law because under either standard, Yale's motion will be denied. As discussed above, Sleem has presented enough evidence upon which a reasonable juror could find that Yale acted negligently. That same evidence could also support a reasonable fact finder's determination that Yale acted with constitutional malice (recklessness), even under a clear and convincing evidentiary standard.

Yale also contests the constitutionality of North Carolina's punitive damages scheme under *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) and *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir.1991). The court finds that this issue is not yet ripe. Should this case go to trial, and should instructions on punitive damages be appropriate based on the evidence presented at trial, the court will instruct the jury in a manner it deems consistent with *Haslip, Mattison,* and North Carolina law. Even if North Carolina has not yet reconsidered its punitive damages scheme in light of *Haslip* at the time of trial, such instructions on punitive damages can still be given. Under such a scenario, the federal court's task will be to predict what effect, if any, the *Haslip* decision would have on North Carolina law and instruct the jury accordingly. *Johnson v. Hugo's Skateway,* 974 F.2d 1408, 1417 (4th Cir.1992). Should Yale disagree with the instructions, it can then appeal and challenge the constitutionality of the instructions and North Carolina's punitive damages scheme.

## V. SUMMARY

The court will deny Yale's motion for partial summary judgment as to the libel *per se* issue since, in the least, the publication is capable of two reasonable interpretations one of which is defamatory. The court will also deny Yale's motion for summary judgment since the publication at issue is reasonably susceptible to an obviously defamatory meaning. As such, it is a jury question if, in fact, the publication were libelous. Additionally, even if Yale does have a qualified privilege to publish directories, Sleem has defeated this privilege for summary judgment purposes by raising genuine issues of material fact as to Yale's negligence. Thus, the defamation claim shall proceed under a "capable of two reasonable interpretations" libel theory.

As to negligent infliction of emotional distress, the court concludes that Yale has a duty to act reasonably to protect others from harm. Genuine issues of material fact exist as to foreseeability, causation, and severe emotional distress. Combining this with the existence of genuine issues of material fact as to negligent conduct, summary judgment as to Sleem's negligent infliction of emotional distress claim is also inappropriate.

The court will also deny Yale's motion for partial summary judgment as to presumed damages, concluding that whatever the merits of Yale's arguments as a policy matter, presumed damages are not constitutionally infirm under either the United States or North Carolina constitution.

As to Yale's motion regarding punitive damages, evidence exists upon which a reasonable juror could find that Yale acted recklessly. Further, the court concludes that the constitutional issue under *Haslip* is not yet ripe and, thus, Yale's motion is denied as to this issue.

Thus, the libel action will be tried on a "capable of two reasonable interpretations" legal theory. The jury will be asked to decide whether the publication was defamatory, and if it was so understood by those who saw it. Strict liability is the rule and, hence, no fault will have to be proven. Damages to reputation will be presumed but, of course, this presumption can be rebutted by Yale. Any other type of damage will have to be proven by Sleem.

As to negligent infliction of emotional distress, the jury will be asked to decide whether Sleem has proven each element of such a cause of action.

Finally, should the jury find for Sleem on his libel claim, but not his negligent infliction of emotional distress claim, the court will rule on the issue of qualified privilege.[8]

---

8. Perhaps consideration should be given to a special verdict form, so it will be clear whether or not the jury finds Yale to have acted in a negligent manner.